The **PADDINGTON CORPORATION, a corporation, and Justerini & Brooks, LTD., Plaintiffs,**

v.

**MAJOR BRANDS, INC., a corporation, Defendant.**

No. Civ–72–186.

United States District Court,
W. D. Oklahoma.

June 21, 1973.

---

John B. Hayes, Watts, Looney, Nichols & Johnson, Oklahoma City, Okl., Shacter, Parris, Goldman & Ellison, New York City, Melvyn L. Cantor, Simpson, Thacher & Bartlett, New York City, for plaintiffs.

Patrick C. Ryan, Oklahoma City, Okl., for defendant.

## MEMORANDUM OPINION

BOHANON, District Judge.

This action was commenced by The Paddington Corporation ("Paddington") and Justerini & Brooks, Ltd. ("Justerini") in March of 1972. The complaint and amended complaint seek a permanent injunction and damages flowing from defendant's unfair and deceptive trade acts and practices, common law and statutory trademark and trade name infringement and tortious interference with contractual rights. In its answer, which substantially admits plaintiffs' allegations although denies that plaintiffs

are entitled to any relief, defendant Major Brands, Inc. ("Major Brands") sought to allege a counterclaim under the antitrust laws of the United States. The parties have engaged in discovery to the extent of serving upon one another comprehensive interrogatories and answers thereto.

Plaintiffs have moved for summary judgment on their complaint and for the purposes of the motion, have waived damages and seek only a permanent injunction against Major Brands ever again committing any of the acts of which complaint is made. Plaintiffs have also moved for summary judgment dismissing the counterclaim. This Court finds that there is no genuine issue as to any material fact in this proceeding and concludes that, upon the applicable authorities, plaintiffs' motion should be granted in all respects.

There is virtually no dispute as to the material facts in this matter, which may be summarized as follows:

Justerini [1] is an English corporation without any offices or employees in the United States. It is the blender of a Scotch whisky commonly known as "J & B." Paddington is a Delaware corporation with its principal place of business in New York City and is Justerini's "sole representative" in the United States.

Major Brands is an Oklahoma corporation with its principal place of business in Oklahoma City. It states that it is an importer of various liquor products although, at present, the only license which it holds from the State of Oklahoma is a "bonded warehouse" license.

Justerini has no dealings with any United States purchaser of J & B Scotch whisky (except, of course, Paddington). All such dealings with United States customers are conducted by Paddington. Justerini's sole contact with United States purchasers is to fill orders submitted to it by Paddington.

Paddington sells J & B in two markets. One market, which constitutes approximately 99% of Paddington's business, is basically the wholesale liquor industry in the United States. The second market, constituting approximately 1% of its sales, is the "duty-free" or export market. For a number of reasons, including principally that Paddington (a) need pay no import duty on "duty-free" sales; (b) does no advertising in "duty-free" markets; (c) has neither sales force nor promotional expenses in "duty-free" markets; and (d) because of the goodwill involved, Paddington sells in the "duty-free" or export market at a lower price than it sells to wholesalers within the United States.

The transaction with which we are here concerned commenced on or about August 17, 1971, when a representative of the Druss Army and Navy Store ("Druss") of Galveston, Texas, called Paddington and spoke with a Miss Leona Silverman. Druss was evidently known by Miss Silverman and Paddington generally to be a "duty-free" merchant. In their conversation, the Druss representative stated to Miss Silverman that Druss wished to order 1,000 cases of J & B fifths and that shipment was to be made as soon as possible. Miss Silverman requested that the order be confirmed in writing.

Soon after August 17, 1971, Paddington received a written order from Druss for 1,000 cases of J & B fifths. The order stated: "no strip stamps affixed." Since strip stamps are necessary for importation and sale in the United States, this statement in the language of the trade constituted an express representation by Druss that the J & B ordered was for resale in "duty-free" markets.

In due course, the 1,000 cases of J & B were shipped to Druss, and on or about October 12, 1971, Paddington billed Druss in the amount of $14,250 or $14.25 per case. This amount is substantially below the price which Paddington charges to Oklahoma wholesal-

1. The name "Justerini & Brooks" has been protected by Federal registration since May 17, 1938.

ers, even after allowing for the fact that this figure did not include import duty and applicable tax.

In early 1972, plaintiffs learned that Druss had not, in fact, resold the J & B in "duty-free" markets as it had represented. Rather, it had resold it to Major Brands who had, in turn, paid the duty and applicable tax and then resold it to Oklahoma wholesalers at a price somewhat less than that being charged by Paddington to Oklahoma wholesalers.[2]

After purchasing the J & B from Druss, Major Brands proceeded to mutilate the J & B labels in the following respects:

(a) The words "duty-free," which had been placed on the labels to indicate that the goods could not legally enter the United States since no strip stamps had been affixed, were covered with a thin white label sticker bearing the legend "Imported by Major Brands, Oklahoma City."

(b) The words "Imported by the Paddington Corporation, New York, New York" were covered with a thin white label sticker.

Major Brands contended that at the time it ordered the J & B from Druss, it had no knowledge that it was to receive "duty-free" liquor. This contention is difficult to believe since Major Brands is obviously knowledgeable concerning the liquor industry and has demonstrated familiarity with the prevailing wholesale prices for liquor in Oklahoma and must have known that it was obtaining this liquor at a substantially lower price than generally available in Oklahoma. Moreover, Druss is evidently well-known as a merchant of "duty-free" liquor and Major Brands must have learned this fact at a conference which it admits was held between its officials and officials of Druss in August, 1971. These facts should at the least have put Major Brands on notice as to the fact that it would be obtaining "duty-free" liquor. There appears no other logical or rea-

sonable conclusion and none has been argued or suggested. In any event, this Court need not resolve this factual question since Major Brands has admitted that when it received the 1,000 cases of J & B from Druss, the words "duty-free" were clearly imprinted on the label of each bottle, and it was Major Brands which proceeded to mutilate the label in the manner described above.

The uncontradicted affidavits on file also indicate that, upon learning that Major Brands had J & B for sale at a lower price than did Paddington, Oklahoma wholesalers became irritated and dissatisfied with Paddington, perhaps thinking that Paddington had given Major Brands a price advantage. It is also uncontroverted that at least one Oklahoma retailer complained to Paddington's representative that the mutilation of the labels by Major Brands had caused the retail consumer incorrectly to believe that Paddington and Justerini deal in "seconds" or Scotch whisky of an inferior quality to that ordinarily marketed under the brand name J & B.

Major Brands' action in mutilating the labels of J & B constitutes common law and statutory trademark infringement. Thus, in J. C. Penney Co. v. Parrish Co., 339 F.Supp. 726 (D.Idaho 1972), the defendant was enjoined from selling goods bearing plaintiff's private label, the Court noting that:

"The unauthorized advertising, display and/or sale by defendant of merchandise bearing plaintiff's 'private label' trade names and/or trademarks constitutes statutory and common law trademark infringement. (15 U.S.C. § 1114)" *Id.* at 727.

Such activity, the Court stated, violated the rights of the plaintiff because it was "likely to cause confusion or misunderstanding as to defendant's affiliation, connection or association with, or certification by plaintiff." *Ibid.* Moreover, there was a substantial likelihood of "injury to plaintiffs' business reputation

---

2. Major Brands charged $52.50 per case (including tax) FOB Oklahoma City while Paddington was charging $52.50 per case FOB New York.

and of dilution of the distinctive quality of plaintiff's trade names and trademarks." *Ibid.*

■ In the opinion of this Court, Major Brands' mutilation of the J & B labels by designating itself as the importer in place of Paddington and pasting over the "duty-free" marking was an unconscionable attempt to deceive and mislead both wholesalers and consumers as to Major Brands' relationship with Justerini, and may well have injured the business reputation of both Justerini and Paddington. As noted above, wholesalers in Oklahoma became dissatisfied with Paddington, thinking that it had favored Major Brands with a substantial price advantage. Further, the mutilation of J & B labels misled consumers into believing that Paddington and Justerini deal in "seconds" or Scotch whiskies of an inferior quality to that marketed under the unmutilated J & B label. Such activity also constitutes a violation of the Oklahoma Deceptive Trade Practices Act, 78 O.S., §§ 51–54. This act, among other things, is designed to prevent a business entity from making a false representation as to the (1) "source, sponsorship, approval, or certification of goods . . ."; (2) "affiliation, connection, association with, or certification by another"; or other activity which (3) "disparages the goods, services, or business of another by false or misleading representation of fact; . . ." By mutilating the labels in the manner described and selling the J & B to Oklahoma liquor wholesalers, Major Brands violated the partially quoted provisions and possibly others.[3]

Finally, although it is unnecessary to decide the point, the Court notes that Major Brands' conduct is certainly questionable under the criminal laws of the United States, particularly 18 U.S.C. § 2314, which provides as follows:

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, *knowing the same to have been* stolen, converted or *taken by fraud*; or

"Whoever, having devised or intending to devise any scheme or artifice to defraud, *or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,* transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more;

. . . . . .

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both." (Emphasis added.)

Although Major Brands contends that it had no knowledge of any representation made by Druss to Paddington, it has admitted mutilating a label which clearly should have put it on notice that these goods were obtained by the representation that they would not be resold in the United States. Indeed, it has admitted in its answers to interrogatories that it knew that "duty-free" liquor is sold at a preferentially low price.

In any event, Major Brands has been guilty of unfair and deceptive business practices which will not be countenanced by this Court.[4]

As noted above, in its answer Major Brands asserted a counterclaim under

---

3. In addition, plaintiffs are entitled to injunctive relief under the Lanham Act, 15 U.S.C. §§ 1125(a) and 1126(h).

4. Major Brands also seems to have violated 27 U.S.C. § 205, which provides, *inter alia,* that:
   "It shall be unlawful for any person to alter, mutilate, destroy, obliterate, or remove any mark, brand, or label upon distilled spirits, wine, or malt beverages held for sale in interstate or foreign commerce or after shipment therein, except as authorized by Federal law or except pursuant to regulations of the Secretary of the Treasury authorizing relabeling for purposes of compliance with the requirements of this subsection or of State law."

the antitrust laws of the United States. Although purporting to rely on a number of statutes, the only claims which Major Brands seemed seriously to put forward were under Section 1 of the Sherman Act (15 U.S.C. § 1), and can be stated as follows.

First, that the agreement between Justerini and Paddington appointing Paddington as Justerini's "sole representative" in the United States was unlawful. Second, that an alleged agreement between Paddington and Druss providing that Druss would only resell in "duty-free" markets the J & B which it had received at a preferentially low price was also unlawful. This Court finds no merit in either of these claims.

■ With regard to the first claim, the law is perfectly clear that absent any purpose to create or maintain a monopoly, a corporation, like an individual, has the right to deal with whomever it wants. This principle was first stated by the United States Supreme Court more than 50 years ago in United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), in the following terms:

"The purpose of the Sherman Act is . . . to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." (250 U.S. at 307, 39 S.Ct. at 468)

This principle has been reiterated by the Court of Appeals for this Circuit

most recently in Shawver & Son, Inc. v. Oklahoma Gas & Electric Co., 463 F.2d 204 (10th Cir. 1972) and less recently in Naifeh v. Ronson Art Metal Works, Inc., 218 F.2d 202 (10th Cir. 1954).

■ Major Brands concedes that plaintiffs are not monopolizing nor are they attempting to monopolize any relevant market—for example, the Scotch liquor market.[5] This concession puts to an end any inquiry regarding the alleged unlawfulness of any refusal to deal by the plaintiffs.

■ There is, however, an additional defect in Major Brands' contentions in this respect and that is that Major Brands has admitted in its answers to interrogatories that it has never even attempted to purchase J & B from either Justerini or Paddington, or indeed from anyone else with the exception of Druss. In the absence of an attempt to deal, an antitrust claimant lacks standing to complain of an alleged refusal to deal. See, e. g., Saunders v. National Basketball Association, 348 F.Supp. 649, 654–656 (N.D.Ill.1972); Dole Valve Co. v. Perfection Bar Equipment, Inc., 311 F.Supp. 459, 461 (N.D.Ill.1970); Ryan v. The California Co., 1957 CCH Trade Cases ¶ 68, 651 at p. 72, 647 (D.Col. 1957).

Major Brands' second antitrust argument revolves around its contention that Paddington and Druss agreed that Druss would only resell the "duty-free" J & B which it purchased at a preferentially low price in the "duty-free" market. This claim has been denied under oath by the Executive Vice President of Paddington, who stated that there was no agreement between Paddington and Druss although there was an express representation by Druss, in the sense that Druss was known to be a "duty-

5. Major Brands does contend that plaintiffs are attempting to monopolize the market in "J & B Scotch whiskey." However, once again the law is clear that this is not a relevant market for purposes of determining the lawfulness of the agreement between Paddington and Justerini. See, e. g., Bushie v. Stenocord Corp., 460

F.2d 116 (9th Cir. 1972); Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418, cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899 (D. Md.), aff'd per curiam, 239 F.2d 176 (4th Cir. 1956).

free" merchant and that in its order of the 1,000 cases it clearly stated "no strip stamps affixed," which is in the language of the trade a representation that the goods will not be brought into the domestic market. Although given every opportunity to do so, Major Brands supplied no competent affidavit disputing this sworn testimony by Paddington.

■ It is unnecesary to resolve this alleged factual issue, however, since this Court concludes that even if such an agreement had existed between Paddington and Druss, it would not have violated Section 1 of the Sherman Act.

Major Brands argues that any such agreement would have violated the law as stated in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) and in United States v. Glaxo Group Ltd., 302 F.Supp. 1 (D.Del.1969). However, these two cases are clearly inapposite. In each the Court found a violation of the antitrust laws where the manufacturer had engaged in an admitted, comprehensive scheme to control the resale and/or method of resale of its products. Further, *Glaxo* also involved a larger agreement between *Glaxo* and one of its competitors to divide markets and sales between themselves. On the contrary, the most that existed in the instant case was an agreement between Paddington and a purchaser who was given a preferential price upon its express representation that it would only resell the goods in a market which did not compete with the United States domestic market.

Two recent cases establish the legality of any such agreement, even if it existed. In Carter-Wallace, Inc. v. United States, 449 F.2d 1374 (Ct.Cl.1971), Carter-Wallace had sued the government for unauthorized use of its drug meprobamate. The government answered by asserting various defenses including an alleged violation of Section 1 of the Sherman Act. Under the Sherman Act allegations, the government asserted that Carter-Wallace had sold meprobamate to certain drug companies with the restric-

tion that these companies could resell this drug only in combination with certain other drugs. This arrangement was alleged to violate Section 1 of the Sherman Act as interpreted in *Schwinn*.

The Court of Claims disagreed, however, for the reason that the purchasing drug companies were only compelled to resell meprobamate in combination with other drugs if they purchased it at a preferential price. In granting Carter-Wallace's motion to dismiss the antitrust defense, the Court found that Carter-Wallace sold meprobamate at two prices. Anyone purchasing at the higher price was free to resell the drug on any terms or conditions that he saw fit. However, anyone who purchased at the lower or preferential price had to abide by the restrictions imposed by the manufacturer. The Court found this practice to be perfectly reasonable and not at all in violation of the antitrust laws.

Similarly, in Tripoli v. Wella Corp., 425 F.2d 932 (3rd Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970), the Court of Appeals for the Third Circuit affirmed the grant of summary judgment to a manufacturer of cosmetics where the manufacturer had terminated a distributor who had refused to adhere to an agreement between them that the distributor resell certain products only to professional beauticians. The Court found that this restriction on the distributor was reasonable in light of the fact that the product in question could be potentially dangerous if it fell into unskilled hands and also, of particular relevance here, in light of the fact that there was a price difference between the product intended for professional beauticians and the product sold generally to the public and that, absent this limitation on resale, the manufacturer might well find itself defending price discrimination lawsuits. 425 F.2d at 939.

It is also noteworthy that Major Brands' "standing" to raise this claim is at best questionable. In its answers to interrogatories, Major Brands admitted

that the only time it attempted to purchase J & B Scotch was the one successful attempt from Druss.[6] The law is that in order to maintain a suit under the antitrust laws, a private litigant must demonstrate that he was "injured in his business or property by reason of anything forbidden in the anti-trust laws . . . ." (15 U.S.C. § 15). If Major Brands made only the one attempt to purchase J & B, it is difficult to see how any alleged agreement between Paddington and Druss could have caused it injury.

In any event, what Major Brands is claiming here is that it has the right to purchase goods from a "duty-free" merchant who obtains those goods at a preferentially low price upon the express representation that the goods will only be resold for export. There is no basis in law to support this contention.

For all the reasons stated above, plaintiffs' motion for summary judgment is granted in all respects. Defendant's counterclaim is dismissed with prejudice and on the merits. Furthermore, this Court has found that, in light of the admitted mutilation of plaintiffs' labels, a permanent injunction is necessary to protect plaintiffs' property rights and also to protect the public at large from any repetition of defendant's unfair and deceptive acts. Consequently, Major Brands, its officers, agents, servants, employees and any other person acting in active concert or participation with them are enjoined from mutilating, altering, modifying, tampering with or in any other respect changing the labels, bottles or packaging of any product sold or consigned by plaintiffs, or either of them. Major Brands, its officers, agents, servants, employees and any other person acting in active concert or participation with them are also enjoined from purchasing, accepting on a consignment basis or in any other respect dealing in the products of plaintiffs, or either of them, in the United States domestic market where Major Brands, or such officers, agents, servants, employees or other persons acting in active concert or participation with them know or have reason to know that such products have been sold or consigned by plaintiffs, or either of them, at a preferentially low price upon the representation by the purchaser or consignee that the goods will not be resold in the United States domestic market.

Pursuant to the provisions of the Oklahoma Deceptive Trade Practices Act, 78 Okl.Stat., § 54(b), plaintiffs are awarded an attorney's fee in the amount of $12,500.00. Such award is based upon the Court's finding and conclusion that Major Brands has "willfully engaged in a deceptive trade practice . . . ." Even if Major Brands did not "willfully" engage in deceptive trade practices, the Court in its discretion is authorized by the statute to award attorney fees to the prevailing party. In fixing the amount of attorney fees allowed, the Court has not considered the time spent by plaintiff's counsel in defending the counterclaim of defendant, but has taken into consideration the fact that plaintiff relied upon several theories to support the requested relief in addition to alleged violations of the Oklahoma Deceptive Trade Practices Act.

This opinion shall constitute this Court's findings and conclusions pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

---

6. In an affidavit submitted in opposition to this motion, Major Brands' president stated that there was a subsequent attempt to purchase J & B from Druss which was allegedly unsuccessful. This statement, which was unsupported by an affidavit from Druss, would seem to contradict Major Brands' sworn answers to interrogatories.