**F. SCHUMACHER & COMPANY,**
**Plaintiff,**

v.

**SILVER WALLPAPER & PAINT COMPANY, INC., Defendant.**

**Civ. A. No. 92–4295.**

United States District Court,
E.D. Pennsylvania.

Dec. 21, 1992.

John R. Embick, Kittredge, Donley, Elson, Fullem and Embick, Philadelphia, PA, Margaret M. Zwisler, Dimitri J. Nionakis, Richard A. Ripley, Howrey & Simon, Washington, DC, for F. Schumacher & Co.

Steven A. Asher, Kohn, Savett, Klein & Graf, P.C., Scott A. Burr, Kohn, Nast & Graf, P.C., Philadelphia, PA, for Silver Wallpaper & Paint Co., Inc.

## MEMORANDUM

BRODY, District Judge.

In considering plaintiff's motion for a preliminary injunction I must first determine whether certain statements of the defendant violate Section 43(a) of the Lanham Act on the basis of using misleading misrepresentations of fact likely to cause confusion about defendant's affiliation with plaintiff.

Next I must decide whether a marketing policy adopted by plaintiff constitutes an enforceable term in its contract with third parties such that by inducing the third parties to disregard the policy defendant tortiously interferes with a contract.

Finally, I must decide whether defendant tortiously interfered with plaintiff's prospective business relations when defendant purchased plaintiff's products from third party retailers, causing plaintiff to refuse

to deal with those retailers based on the terms of defendant's marketing policy.

For the reasons that follow, I will grant in part and deny in part plaintiff's motion on the Lanham Act claim and deny its motion on the tortious interference claims.[1]

## FACTUAL BACKGROUND

F. Schumacher & Company ("Schumacher") is a corporation that designs, manufactures, purchases and sells fabrics, wallcoverings and other home furnishing products. A division of Schumacher, FSC Wallcoverings ("FSC"), sells its Schumacher, Gramercy, Waverly and Village brand wallcoverings directly to independent retailers, chains and decorators. The defendant, Silver Wallpaper and Paint Company, Inc. ("Silver"), was until March 1992 a Schumacher retail dealer.

Silver is a corporation that discounts fabrics and wallcovering products it obtains from more than 100 different manufacturers or distributors. Silver operates its business both from its Philadelphia showroom and nationwide through an "800" telephone exchange. When customers call Silver with a pattern number, Silver's operators enter that number into a computer to ascertain information regarding the manufacturer, price, discounts and other details about the customer's requested pattern. If Silver cannot fill the order from its own inventory, it obtains the ordered product from another distributor and ships the goods to the customer under its own label.

In January 1990, Schumacher adopted a Marketing and Advertising Policy (the "marketing policy"), which became effective in March 1990. The policy takes the form of a list of Schumacher's "expectations with respect to the marketing of [its] products," and includes among its points the following: that Schumacher retail dealers shall not resell Schumacher wallcovering products to other retailers without Schumacher's prior approval; that Schumacher retail dealers shall not solicit or sell Schumacher wallcovering products outside their "local trading areas;" and that Schumacher reserves the right to stop doing business with and/or withdraw some or all of the Schumacher brands from retail dealers that violate the policy.

Retail dealers do not sign or formally agree to Schumacher's marketing policy. The only signed written agreement between Schumacher and its retail dealers is a renewable agreement for the purchase of wallcovering sample books at a discounted price. Schumacher publishes its marketing policy in price books distributed to retail dealers every year.

After Schumacher adopted its marketing policy in March 1990, Schumacher conducted a series of undisclosed "test orders" with various retail dealers, including Silver, to ascertain whether they were selling Schumacher products in violation of Schumacher's local trading area requirement. Schumacher determined that Silver was selling Schumacher products outside of its assigned area, and on March 18, 1992 advised Silver it was terminated as a Schumacher retail dealer. At that time Silver had a significant amount of Schumacher product in its inventory.

Despite its termination by Schumacher, Silver continues to receive and accept orders for Schumacher products over its "800" number telephone service. In the process of taking orders from customers, Silver operators provide callers with information about Schumacher products.

Schumacher continued to monitor Silver after its termination through additional "test orders." On each of several occasions, a Schumacher employee or other designee called Silver's "800" telephone number and placed orders for "slow selling" Schumacher wallcovering patterns. After placing each order, Schumacher monitored its retail dealers for the posting of a sale of

**1.** Plaintiff's complaint stated causes of action under the Lanham Act and Pennsylvania state law causes of action for tortious interference with existing and prospective contractual relationships, defamation, and action for the price of goods sold and accepted. At the hearing on

its Motion for a Preliminary Injunction, however, plaintiff pressed only the Lanham Act claim and the tortious interference claim. Accordingly, I need only decide those two claims in connection with plaintiff's motion.

the exact quantity and pattern ordered by the Schumacher tester.

In the course of the test ordering, Schumacher employees documented statements made to them by Silver employees. On one occasion, a Silver operator stated that, "We will contact the manufacturer in the morning and you should have your paper in one to two weeks." (Tr. at 128). A second Schumacher test caller was told by a Silver operator that Silver is "not authorized to discount [the ordered] pattern ..." because "the company [Schumacher] does not want their wallpaper discounted on the 800 number." (Tr. at 137). A Silver operator told a third Schumacher test caller that the order was unavailable because it was "a Schumacher pattern and they don't sell it through the 800 number any more." (Tr. at 146).

The court heard evidence in the form of deposition testimony from one consumer who attempted to order a particular pattern of Schumacher wallpaper over Silver's "800" telephone number in June 1992. The consumer testified that based on Silver's quotation of a price for the Schumacher product, she believed Silver and Schumacher were affiliated. (Tr. at 157–58). The consumer further testified that when she called again to order the product a Silver operator informed her the discount was no longer available because Schumacher had prohibited Silver from discounting that particular pattern a week earlier. (Tr. at 159).

Two Schumacher retail dealers, Wallcovering Concepts and Marconi company, were terminated by Schumacher for violating the marketing policy by "transshipping" Schumacher products to Silver without Schumacher's prior approval. Schumacher has not terminated two larger chain dealers that also sold Schumacher products to Silver without Schumacher's approval. The reason Schumacher articulates for the discrepancy is that it has not established the chain retailers knowingly transshipped to Silver in violation of Schumacher's marketing policy.

Schumacher seeks injunctive relief requiring Silver affirmatively to disclaim any affiliation with Schumacher when conducting business over its 800 telephone service and restraining Silver from purchasing Schumacher products from Schumacher's retail dealers.

## DISCUSSION

### I. INJUNCTION STANDARDS

I must decide whether Schumacher has presented sufficient evidence to show a reasonable likelihood of succeeding on the merits of each cause of action; whether Schumacher is irreparably harmed by Silver's conduct; whether other parties, including Silver, will be substantially harmed by my granting an injunction; and whether the interests of the general public would be well served by my granting an injunction. *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 191–92 (3d Cir.1990).

### II. LIKELIHOOD OF SUCCESS ON THE MERITS

#### A. *The Lanham Act Claim*

The crux of Schumacher's Lanham Act claim is whether it has met its burden for a preliminary injunction when the relevant evidence Schumacher has presented is that after Schumacher refused to continue to ship its product to Silver, Silver made the following three statements, the second of which caused actual confusion to one consumer:

(1) "We will contact the manufacturer [Schumacher] in the morning and you should have your paper [product] in one or two weeks;"

(2) "[Silver] is not authorized to discount [the ordered] pattern;" and

(3) the order was unavailable because it was "a Schumacher pattern and they don't sell it through the 800 number any more."

The Lanham Act, originally enacted in 1946 and modified in 1988, was intended to expand the scope of federal protection against unfair competition.[2] Section 43 of the Act provides that:

protect persons engaged in [interstate] com-

**2.** An express purpose of the Lanham Act was "to

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,

\* \* \* \* \* \*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125.

The threshold question is whether Silver's actions in this case—statements by a telephone operator—amount to "use [of a] misleading description of fact [or a] misleading representation of fact" that "is likely to cause confusion ... as to the affiliation" of Schumacher with Silver.

Although there is no directive from the Third Circuit other circuits have addressed the issue. In *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1023 (2d Cir.1989), for example, the Second Circuit held that "the unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation. Similarly in *Monte Carlo Shirt, Inc. v. Daewoo Int'l Corp.*, 707 F.2d 1054, 1058 (9th Cir.1983), the Ninth Circuit upheld the district court's grant of summary judgment where the defendant merely sold the plaintiff's genuine trademarked product at a discount without plaintiff's authorization. When Silver "uses" actual statements he has done more than merely sell Schumacher's product and therefore is outside the parameter of *Hayden*.

On the other hand the cases Schumacher cites in support of its claim all involve conduct on the part of defendants that is more extensive than Silver's telephonic statements. *See, e.g., ESPN, Inc. v. Edinburg Community Hotel, Inc.*, 735 F.Supp. 1334, 1343 (S.D.Tex.1986) (defendant intercepted plaintiff's cable programs via satellite dish, advertised programs to guests and charged for their usage); *Healthco Int'l, Inc. v. A-dec, Inc.*, 1989–2 Trade Cas. (CCH) 68,703, 61,696, 1989 WL 104064 (D.Mass.1989) (defendant made false representation as to the physical quality of its product); *Louisiana–Pacific Corp. v. Nu–Sash of Pittsburgh, Inc.*, 1974 WL 20246, 184 U.S.P.Q. 593 (W.D.Pa.1974) (defendant infringed plaintiff's trademark by attaching a substantially similar mark to its own product); *Volkswagenwerk Aktiengesellschaft v. Dreer*, 253 F.Supp. 37 (E.D.Pa. 1966) (defendant converted automobiles intended for European markets for resale in America and conveyed itself as an authorized dealer).

Between these two extremes are two cases specifically relied upon in *Hayden*. In both *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 911 (Fed.Cir. 1984) and *Stormor, A Div. of Fuqua Indus. v. Johnson*, 587 F.Supp. 275, 279 (W.D.Mich.1984), the defendants' actions were deemed sufficient to trigger section 43(a) liability. In *Bandag*, the Federal Circuit held that although the defendant could affirmatively advertise that it sold plaintiff's products, defendant was "obliged not to do it in a manner which would have been likely to suggest to prospective customers that it was part of the [plaintiff's] organization of franchises." Similarly in *Stormor*, the court enjoined the defendant from using plaintiff's trademarks "in a manner which is likely to cause the public to believe that defendants are part of [plaintiff's] authorized sales network."

■ Thus to impose liability under 43(a) requires that the defendant "use" statements from which can be inferred facts that are "misleading" and consequently "likely to cause confusion." Silver's conduct involved more than the mere unauthorized sale of trademarked Schumacher

merce against unfair competition." 15 U.S.C. § 1127 (1982), amended by 15 U.S.C. § 1127 (Supp.1989) (content of intent statement unchanged).

products. Silver took the additional step of making affirmative statements to consumers regarding the Schumacher products. I find that such statements are a sufficient holding out as an affiliate to fall within the scope of section 43(a) of the Lanham Act.

Congress in 1988 amended section 43(a) of the Act to expand liability from false descriptions or representations to *misleading* representations of fact *likely to cause confusion*.[3] Schumacher presented no evidence of the falsity of Silver's statements or representations and it clearly would have failed under the pre-amendment version of the Act. Under the amended version, however, I find that Silver's statements were sufficiently misleading to satisfy the statutory standard of "likely to cause confusion, mistake or deception."

Silver's statement that it will "contact the manufacturer in the morning and [the consumer] should have [the] paper in one or two weeks" is clearly misleading in that it leads consumers to infer that Silver is affiliated with Schumacher and that the wallcovering product originates from Schumacher. Similarly, Silver's statement that "[Silver] is not authorized to discount [the ordered] pattern" misleads consumers to infer an ongoing affiliation between Schumacher and Silver that would permit Silver to discount other Schumacher patterns. Similarly, Silver's representation that the order was unavailable because it was "a Schumacher pattern and they don't sell it through the 800 number any more" creates a possible inference that Schumacher does not authorize Silver to market that particular pattern over its 800 number, but that other Schumacher patterns are available through Silver at a discount that is authorized by Schumacher.

In addition, Schumacher presented testimony of one consumer who actually experienced confusion as to the affiliation of Silver and Schumacher. The strongest evidence of the likelihood of consumer confusion in a Lanham Act case is actual confusion. *Wearguard Corp. v. Van Dyne-Crotty, Inc.*, 1991 WL 125890 at 3, 1991 U.S.Dist. LEXIS 8850, at 9 (E.D.Pa. June 27, 1991). The testimony of the consumer in the present case was that the basis of her confusion as to the affiliation of Silver and Schumacher was her receipt of price quotations from Silver for a Schumacher product. That testimony alone would be insufficient, as Silver's price quotation was neither false nor misleading. However, the consumer further testified that a Silver operator informed her when she called a second time that the Schumacher product she desired could no longer be discounted at Schumacher's instruction. In addition to the likelihood of confusion deriving from inferences drawn from Silver's statements, there exists actual confusion in the marketplace.

Thus I find it is reasonably likely based upon the evidence presented that Schumacher will prevail on the merits of its Lanham Act claim at a final hearing.

## B. *The Tortious Interference Claims*

Schumacher alleges that Silver tortiously interfered with both its existing contracts and its prospective contractual relations. I address these related issues in sequence.

### i. Existing Contracts

Schumacher contends in its initial brief that it has an enforceable sales contract with each of its retail dealers that includes in its terms a prohibition against transshipping based upon Schumacher's marketing policy.[4] Schumacher contends that Silver

---

**3.** Schumacher distinguishes *Hayden* as having been decided under the pre-amendment Lanham Act. I fail to see the significance of that distinction. *Hayden* stands for the proposition that mere selling of another's trademarked goods, without more, will not trigger liability. Had *Hayden* been decided under the statute as presently amended, the result would be the same. The statutory language upon which *Hayden* hinges, *i.e.,* "uses" in connection with any

goods or services" was not changed by the 1988 amendment. *See* 15 U.S.C. § 1125(a)(1).

**4.** The relevant portion of Schumacher's brief reads: "Silver has interfered with Schumacher's existing contractual relations with its accounts when the 'cooperating dealer' transships the Schumacher products for Silver. At that point, Schumacher has already entered into a sales contract with the 'cooperating dealer' for the products at issue. *This contract incorporates*

tortiously interfered with these contracts by inducing Schumacher's retail dealers to supply Schumacher products to Silver for sale over its 800 number.

At the close of the evidence, Schumacher requested the opportunity to submit post-hearing briefs on the issue of whether a contract exists between Schumacher and its retail dealers incorporating the terms of Schumacher's marketing policy.[5] Although I find that a contract did arise by statute, I also find that the marketing policy is not included as a term of that contract, nor would it be enforceable had it been included.

Schumacher argued for the first time at the close of the evidence that the alleged enforceable sales contracts between Schumacher and its retail dealers arise under the Uniform Commercial Code ("UCC").[6] Schumacher has presented insufficient evidence, however, to prove that the contracts that arise by operation of statute include the terms of Schumacher's marketing policy.

The Pennsylvania statute, tracking the UCC, states the general rule that "a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." 13 Pa.C.S. § 2204(a). Although at first blush this statutory provision appears to take a broader view of possible contract formation than did the common law, the traditional common law identification of offer and acceptance is nevertheless still the touchstone of agreement in cases, like this one, involving simple sales of goods. *See Slocomb Industries, Inc. v. Chelsea Industries*, 36 UCC Rep.Serv. 1543 (E.D.Pa.

1983); Hawkland, Uniform Commercial Code Series § 2–204:02 ("The liberal rules of section 2–204 come into operation only when there is no reasonable doubt that an actual agreement was reached by the parties.")

■ Employing the traditional offer and acceptance analysis in its post-hearing brief, Schumacher contends that its price books are in effect offers to its retail dealers, that the offers are accepted when retail dealers place orders for wallcoverings, and that the transhipping prohibition automatically is included in the resulting contracts because of its inclusion in Schumacher price books. Although I accept Schumacher's approach as to the offer—acceptance analysis, I reject its identification of the price book as the offer and the order as the acceptance. Consequently I reject the terms of the agreement that Schumacher asserts was reached.

Price lists, without more, generally do not constitute offers. Rather, they are commonly regarded as statements of intention to deal or preliminary proposals inviting offers, especially where, as in the instant case, language of specific quantity or commitment is lacking. *See Franklin Sugar Refining Co. v. Howell*, 274 Pa. 190, 118 A. 109, 112 (1922) (price list not part of contract where not specifically incorporated or individualized for the particular sale). *See also* 1 Corbin § 28. Schumacher failed to introduce into evidence its pricebook, documentation of orders and/or shipments of goods specifically referring to the pricebook, or any other evidence to substantiate its broad assertion that its price books constitute offers.[7] Schumacher's price books

*the Marketing and Advertising Policy."* Memorandum In Support Of Plaintiff Schumacher's Motion For A Preliminary Injunction, pp. 13–14. Emphasis added.

5. Plaintiff's request for additional time to re-brief the issues, and necessarily additional time for the defendant to respond to those briefs, suggests a lack of urgency that cannot go unnoticed in an action for a remedy so extraordinary and drastic as a preliminary injunction. *See, e.g., Sovereign Order of St. John of Jerusalem—Knights of Malta by Coleman v. Messineo*, 572 F.Supp. 983 (E.D.Pa.1983).

6. Plaintiff later articulated in its post-hearing brief that its contracts arise under the relevant provisions of the Pennsylvania counterpart to the UCC, 13 Pa.C.S. §§ 2204, 2206 and 2207.

7. Silver asserts in its post-trial brief that because Schumacher failed to introduce the price book into evidence at oral argument, there is absolutely no evidence in the record that Schumacher's marketing policy is a term or condition of sale. Silver's assertion is over-simplified. I must take into account the testimony of Mr. Chevallier that the terms of the policy were

fail to constitute offers to dealers.[8]

By operation of 13 Pa.C.S. §§ 2206 and 2207, a contract may be formed in more complex cases where there is obviously an agreement but the precise points of offer and acceptance are not apparent. In what has become known as the "battle of the forms," an order for goods and a subsequent shipment of goods will give rise to a contract, the terms of which are determined by the precise language of the forms and the conduct of the parties.

Schumacher cites a series of cases, only one of which is decided under applicable Pennsylvania law, in which enforceable contracts were formed by battling forms. None of these cases, however, undermines the foregoing analysis. The cases are different from the matter at hand in two critical respects. First, the price quotations in the cases Schumacher cites are correctly considered offers because they are directed at one particular buyer and contain specific terms of quantity and commitment. In the case at hand, Schumacher's price books are distributed to all Schumacher retailers, and no evidence was presented as to the specificity of terms. Second, the terms given effect in the cited cases were printed on either the offer form or the acceptance form. In the case at hand, there is no evidence that the terms of Schumacher's marketing policy appear on any form of consequence to offer and acceptance. Rather, the marketing policy language appears in Schumacher's price book, which never entered any battle of contract formation. *See Falcon Tankers, Inc. v. Litton Systems, Inc.,* 355 A.2d 898 (Del.Super.1976) (offer form subjecting agreement to "conditions of sale" printed on reverse controlled because seller assented by conduct); *Loranger Plastics Corp. v. Incoe Corp.,* 670 F.Supp. 145 (W.D.Pa. 1987) (offer form stating "terms and conditions" including time limitation for legal

action controlled because buyer did not reject terms by conduct); *In re Earle Industries, Inc. v. Circuit Engineering, Inc.,* 88 B.R. 52 (E.D.Pa.1988) (divergent delivery terms stated on a series of forms were given no effect in resulting contract because parties by their conduct expressly rejected each proposal); *Earle M. Jorgensen Co. v. Mark Construction, Inc.,* 56 Haw. 466, 540 P.2d 978 (Haw.1975) (offer form including limitation of warranty given effect where no form or conduct of buyer rejected term).

■ Finally, Schumacher argues in its post-hearing brief that because Mr. Silver testified to his subjective belief that Schumacher's retail dealers are aware of Schumacher's marketing policy, a contract arises under 13 Pa.C.S. § 2205 (sic) through the "course of dealing" of the parties.[9] 13 Pa.C.S. § 1205 provides:

(a) **Definition of Course of Dealing.**—A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

\*   \*   \*   \*   \*   \*

(c) **Effect on Agreements.**—A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

\*   \*   \*   \*   \*   \*

13 Pa.C.S. § 1205(a) and (c).

Mr. Silver's testimony of his subjective beliefs is irrelevant to whether additional terms are added to a contract of which Mr. Silver is not a part. Because Schumacher has presented no evidence of the course of dealings and the knowledge of the parties to the contracts with which Silver is alleged

---

published in price books distributed to new accounts. (Tr. at 70).

**8.** Contracts probably arose when Schumacher's retail dealers offered to purchase Schumacher products by placing their orders and Schumacher accepted these offers by shipped the goods.

**9.** I assume that plaintiff intended to cite 13 Pa.C.S. § 1205, as the relevant provision of the statute, rather than § 2205, since the former and not the latter is relevant to course of dealing.

to have interfered—*i.e.*, that of Schumacher, Marconi and Wallcovering Concepts—I find that the terms of the marketing policy failed to make their way into the contract by way of the parties' course of dealing.

■ Even had Schumacher included its marketing policy in a document relevant to the formation of a contract under 13 Pa. C.S. § 2207, the terms of the marketing policy would nevertheless be unenforceable. Schumacher's marketing policy reads, in pertinent part, as follows:

> At FSC, we pride ourselves in providing premium home furnishing products backed by a reputation for quality and service. Over the years, we have made a significant investment to market our brands and to create consumer and trade awareness and appreciation for the value these brands represent. We believe there must be consistency between our own efforts and the marketing efforts of our accounts. To ensure that our accounts are aware of our expectations with respect to the marketing of our products, we are setting forth the following policy:

*   *   *   *   *   *

The policy further provides that:

*   *   *   *   *   *

8. Resale of FSC's wallcoverings by accounts to other retailers requires prior approval by FSC.

*   *   *   *   *   *

12. FSC prohibits the solicitation and sale of its wallcovering to consumers outside of an account's local trading area.

13. Violation by an account of any aspect of this Marketing and Advertising Policy may lead to withdrawal of some or all of the FSC brands carried by that account.

14. FSC retains the right to stop doing business on any or all brands with any account whose promotional or selling practices are not in accordance with the spirit of the Company's policy.

*   *   *   *   *   *

The essence of a contract is the mutual exchange of promises. *See Girard Trust Bank v. Life Ins. Co. of N. Am.*, 243 Pa.Super. 152, 364 A.2d 495 (1976); *Universal Computer Sys., Inc. v. Medical Services Ass'n of Pennsylvania*, 474 F.Supp. 472 (M.D.Pa.1979), aff'd 628 F.2d 820 (3d Cir. 1980) (obligation illusory under Pennsylvania law where no special benefit conferred on defendant and plaintiff suffered no detriment); Restatement (Second) of Contracts § 2(1) (promise is a "manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made"); 1 Corbin § 16 ("The fundamental element of promise seems to be an expression of intention by the promisor that his future conduct shall be in accordance with his present expression, irrespective of what his will may be when the time for performance arrives").

In return for its retail dealers' promises not to transship or sell Schumacher wallcoverings outside assigned local trading areas, Schumacher commits to nothing. Rather, it merely reserves the option to do that which it is always entitled to do—to stop doing business with retail dealers that act against its interests. To have an internal corporate policy setting forth how business shall be done is one thing. To give that policy binding legal effect on third parties is quite another. Schumacher's marketing policy as written cannot constitute an enforceable contractual provision.[10]

---

**10.** In addition to the terms of Schumacher's marketing policy being omitted from sales contracts between Schumacher and its retail dealers and the illusory nature of the policy as written, I am not convinced that Silver's actions were "improper" as required for a prima facie showing of tortious interference, *see Adler, Barish, Daniels, Levin, etc. v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1184, appeal dismissed, cert. denied 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979), or that Schumacher has proved pecuniary injury sufficient to support an injunction. *See* Restatement (Second) of Torts § 766 (liability arises "for the *pecuniary loss* resulting to the [plaintiff] from the failure of the third person to perform the contract") and comment "u" thereunder ("[O]ne may be enjoined from conduct *that would subject him to liability* under the rule

Because any contracts which exist between Schumacher and its retail dealers do not contain the terms of Schumacher's marketing policy, and because the policy would be unenforceable had it been included as a term of any such contract, I find that Schumacher has not exhibited a reasonable likelihood of succeeding on its claim for tortious interference with an existing contract.

ii. Prospective Contractual Relations

■ Pennsylvania courts follow the Restatement (Second) of Torts § 766B in adjudicating claims for interference with prospective contractual relations.[11] *See Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971); *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466 (1979); *Koppers Co., Inc. v. Krupp–Koppers GmbH*, 517 F.Supp. 836, 852 (W.D.Pa. 1981). A prima facie showing of tortious interference with prospective contractual relations requires a prospective contractual relation between a third party and the plaintiff, a purpose or intent to harm the plaintiff by preventing the relationship from occurring, the absence of a privilege or justification on the part of the defendant, and the occurrence of actual harm or damage to the plaintiff as a result of the defendant's conduct. *See Glenn*, 272 A.2d at 898; *Thompson Coal*, 412 A.2d at 471; *Koppers*, 517 F.Supp. at 851.

■ Schumacher's argument essentially is that Silver, by maintaining its own legitimate business, causes Schumacher to forego prospective opportunities by forcing it to adhere to terms of a marketing policy that Schumacher alone adopted and thereby terminate retailers doing business with Silver. Schumacher has it backwards in terms of its tortious interference claim. In every case cited by Schumacher, liability for tortious interference with prospective contractual relations is restricted to refus-

als by third parties to deal with the plaintiff as a result of acts by the defendant. *See Stout v. Peugeot Motors of Am.*, 662 F.Supp. 1016, 1018–19 (E.D.Pa.1986) (insufficient evidence that third party refused to deal with plaintiff); *Vintage Homes, Inc. v. Levin*, 382 Pa.Super. 146, 554 A.2d 989 (1989) (liability imposed where third party was discouraged from dealing with plaintiff as a result of defendant's filing lis pendens); *SHV Coal, Inc. v. Continental Grain Co.*, 376 Pa.Super. 241, 545 A.2d 917, 921 (1989) (liability where third party refused to deal with plaintiff because of defendant's actions); *Thompson Coal*, 412 A.2d at 471 (plaintiff failed to establish facts demonstrating prospective business relationship between plaintiff and third parties).

Schumacher has presented no evidence that third party retailers have refused to deal with Schumacher as a result of Silver's actions. To the contrary, the evidence presented by Schumacher is that Schumacher refuses to deal with third party retailers as a result of Silver's actions. Thus, the only thing standing between Schumacher and its prospective contractual relations is its own marketing policy. It is simply not the purview of section 766B to allow recovery where the plaintiff knocks down a straw man it alone sets up.

## III. IRREPARABLE INJURY

■ Where a Lanham Act plaintiff makes a strong showing of likely confusion, irreparable injury follows as a matter of course. *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 196 (3d Cir.1990). The evidence of likely confusion and actual confusion in this case are sufficient showing of Schumacher's irreparable injury absent a limited injunction.

Silver has presented no evidence that it will be substantially injured by my granting a narrowly tailored injunction. To the contrary, Silver seems to have conceded its

---

stated in this section"). (Emphasis added). *See also Hayden*, 879 F.2d at 1024 (pecuniary injury must be established before injunctive relief can issue).

11. Because of the cases plaintiff cites, I assume that plaintiff's allegation of "intentional interference with prospective business relations" sounds under this tort theory.

agreement to an order appropriately limited in scope.[12]

## IV. THE PUBLIC INTEREST

There is no reason to conclude, based upon the record in this case, that the public will be ill served by my granting an appropriate injunction. To the contrary, the public benefits from a wide availability of consumer goods so long as that availability is maintained in a way that precludes confusion, mistake and deception in the marketplace.

## V. CONCLUSION

For the foregoing reasons, I will grant a narrowly tailored injunction restraining Silver and its employees from making the statements and representations that gave rise to this litigation. I will deny Schumacher's request for an affirmative disclaimer of affiliation between Silver and Schumacher.

A basic principle in the law of equitable remedies is that the relief granted should be no broader than necessary to cure the effects of the harm caused. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (nature of violation determines scope of equitable remedy). Especially in light of the First Amendment constraints in the area of commercial speech that is not demonstrably false, *see, e.g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (commercial speech is not completely outside first amendment protection), I am constrained to order the least restrictive means of preventing and eliminating confusion, mistake and deception.

## ORDER

AND NOW, this 22nd day of December 1992, based on plaintiff's motion under section 43(a) of the Lanham Act, 15 U.S.C. § 1125, it is ORDERED that the owners, agents and employees of Silver Wallpaper and Paint Company, Inc. shall refrain from representing or stating to any consumer:

1. that Silver Wallpaper and Paint Company, Inc. purchases wallcovering products directly from F. Schumacher & Company;

2. that F. Schumacher & Company does not authorize or permit Silver Wallpaper and Paint Company, Inc. to discount its products; or

3. that, in connection with the sale or offer for sale of products of F. Schumacher & Company, Silver Wallpaper and Paint Company, Inc. will contact the manufacturer or F. Schumacher & Company for price or product information or to place the consumer's order.

All other relief requested by plaintiff in connection with its Lanham Act claim is DENIED.

It is further ORDERED that all relief requested by plaintiff on its tortious interference claims is DENIED.

---

**12.** Silver seems to concede its agreement to refrain from making the statements which gave rise to this litigation. *See* Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, p. 2. What Silver objects vehemently to, and correctly so, is Schumacher's demand for an injunction requiring Silver affirmatively to disclaim any affiliation with Schumacher. Schumacher presents no legal authority to support its request for me to order a broader injunction than is necessary to alleviate defendant's wrongdoing, and I decline its invitation to do so.