**MATRIX ESSENTIALS, INC., Plaintiff,**

v.

**COSMETIC GALLERY, INC., et al., Defendants.**

Civ. A. No. 92–3400 (JEI).

United States District Court, D. New Jersey.

Dec. 12, 1994.

**1238**

Baker & Hostetler by Louis A. Colombo, R. Scott Keller, Cleveland, OH, for plaintiff.

Morgan Lewis & Bockius by Raymond Cullen, Charles J. Reitmeyer, Philadelphia, PA, for defendants.

IRENAS, District Judge.

This matter was tried before the court, sitting without a jury, on October 17, 18, 20 and 21, and on November 7, 9, and 10. Because of the prior grant of partial summary judgment in favor of the defendants, only three issues remained for trial: (1) whether the sale by defendants of Matrix products

with removed batch or salon codes or other packaging defacement constitutes a violation of plaintiff's rights under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, or New Jersey principles of unfair competition; (2) whether the sale by defendants of Matrix permanent wave products constitutes a violation of plaintiff's rights under the Lanham Act, or New Jersey principles of unfair competition; and (3) whether the procurement and sale of Matrix products by defendants constitutes a tortious interference with plaintiff's contractual rights under the state law of New Jersey. Because we now find that Matrix failed to meet its burden of showing that defendants' conduct violated trademark or unfair competition laws, or that defendants tortiously interfered with Matrix's contracts, we find for defendants on all issues.

## I. PROCEDURAL HISTORY

Matrix initiated this case in 1992, alleging claims of trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, New Jersey statutory and common law unfair competition, malicious interference with contractual relations and prospective economic advantage, the New Jersey Consumer Fraud Act, *N.J.S.A.* § 56:8–1 *et seq.*, and conspiracy to commit these acts. The defendants filed an antitrust counterclaim. On February 26, 1993, the court granted defendants' motion to dismiss plaintiff's claim under the New Jersey Consumer Fraud Act, but denied that motion as to all other claims.

On March 31, 1994, the court granted plaintiff's motion for summary judgment on defendants' counterclaim, and granted in part and denied in part defendants' motion for summary judgment. The court: (1) denied defendants' motion on plaintiff's Lanham Act and unfair competition claims to the extent that plaintiff had shown that defendants sold defaced Matrix products or permanent waves, but granted the motion to the extent that defendants had sold unaltered non-permanent wave Matrix products; and (2) granted defendants' motion for summary judgment on all other claims. On July 22, 1994, the court partially granted Matrix's motion for reconsideration, and reinstated its

tortious interference with contract claim to the extent it sought injunctive, rather than monetary, relief.

As a result of *in limine* motions decided October 12 and October 18, 1994, the court excluded as insufficient all plaintiff's evidence of compensatory and punitive damages. Because only injunctive relief remained, the matter was tried to the court, rather than a jury.

At trial, plaintiff produced the testimony of Patricia Urban, Sydell Miller, Denise Melroy, Ralph DiDonato, Jr., Dennis Gullo, Robert Gullo, Mary Ann Jones, Dr. John Murphy (through a deposition taken de bene esse), Diana Lea Sandonato, portions of the deposition transcripts of Charles and Larry Eisenberg as well as many exhibits. Defendants offered the testimony Charles Eisenberg and Larry Eisenberg as well as several exhibits. Defendants' motions for judgment in its favor on all issues under Fed.R.Civ.P. 52(c), made at the close of the plaintiff's case and at the end of the trial, were denied.

In accordance with the provisions of Fed. R.Civ.P. 52(a), the court shall "find the facts specially and state separately its conclusions of law...." On December 2, 1994, the court issued its initial findings of facts and conclusions of law as well as a final judgment, and now issues its amended findings of facts and conclusions of law.

All facts which the court finds to have been proven have been proven by a preponderance of the evidence. Where the court finds that a particular fact has not been proven, the party with the burden of proof has failed to prove that fact by a preponderance of the evidence.

## II. FINDINGS OF FACT

1. The court deems proven each of the 16 stipulated facts set forth in Section II of the parties' Joint Final Pre–Trial Order and all other facts to which the parties stipulated during the course of the trial.

2. The plaintiff, Matrix Essentials, Inc. (hereinafter "Matrix") manufactures and sells, *inter alia*, a wide variety of hair care products. During the course of this opinion we will refer to "liquid products" as sham-

poos, conditioners, mousses, glazes, styling aids and similar hair care products intended by Matrix to be used both by a cosmetologist on a customer's hair in a salon and by a retail purchaser at home. "Colors and perms" will be used to describe hair dyes, colorings, and permanent wave products which Matrix markets for use by cosmetologists in a salon, but does not market with the intent that these products be sold to individual consumers for home use.

3. Matrix was founded in August of 1980 by Arnie Miller and his wife, Sydell Miller. Mr. Miller was an experienced cosmetologist. First year sales were only $560,000, but by 1993 sales had soared to almost $200,000,000. Mr. Miller died a few years ago, and Mrs. Miller has recently sold the company for an undisclosed sum.

4. Defendant, Cosmetic Gallery, Inc. ("Cosmetic Gallery") operated four retail beauty supply stores in Cherry Hill, Marlton, Clementon and Pleasantville, New Jersey, under the trade name Cosmetique. These stores offer for sale to retail customers a wide range of liquid products and colors and perms manufactured by a large number of different manufacturers.

5. Defendant, C & L Beauty Supply, Inc. ("C & L") operated a wholesale beauty supply business which sold at least some of the products carried in the Cosmetique stores to other retailers on a wholesale basis. C & L's product line included liquid products and perms and colors.

6. On November 1, 1993, while this litigation was pending, the assets of Cosmetic Gallery and C & L were sold two Florida corporations with very similar names (the "Florida corporations"). The Florida corporations were joined as defendants in this litigation shortly before the commencement of trial. On October 18, 1994, the court stayed and bifurcated the case against the Florida defendants in accordance with Fed. R.Civ.P. 42(b).

7. Prior to the sale of assets to the Florida corporations, Charles Eisenberg and Larry Eisenberg each owned 50% of Cosmetic Galleries and 25% of C & L. The sale, however, does not appear to have changed the way Cosmetique or C & L are operated. Day to day management of the stores is still in the hands of defendant Charles Eisenberg. Charles Eisenberg is the President of the Florida corporation that owns Cosmetic Gallery, and Vice President of the Florida corporation that owns C & L.

8. Matrix markets its liquid products and its perms and colors through approximately 30 regional wholesale distributors, each with exclusive geographic territories. These distributors in turn sell the product to salons, barbershops, and beauty parlors (collectively "salons"). The exclusive Matrix distributor in the southern counties of New Jersey and Philadelphia is the DiDonato Corporation, which is located in Mercer County, New Jersey. DiDonato carries primarily Matrix and Nexxus products. Distributors agree with Matrix not to sell Matrix products to any purchaser other than a "salon," which Matrix defines as an operation that generates less than 50% of its income from the retail sale of hair care products.

9. It is well known in the industry that Matrix does not want its liquid products sold at retail by any seller other than a salon. Many of its products carry a legend which reads to the effect: "Guaranteed only when purchased in professional salons," (Plaintiff's Ex. 14Q); or "For sale only in professional beauty salons. Our products are formulated for very specific hair and skin needs. For complete satisfaction, purchase only after consultation at an authorized salon." (Defendant's Ex. 42.) However, it was not until 1990 that Matrix began entering into written contracts with individual salons which provided that the salons would not sell other than to a retail customer for home use. This provision is contained in what have been called the Synergy Salon Success Club agreements (the "salon agreements"). (See, e.g., Plaintiff's Exs. 18 and 19.) Paragraph 7 is the restrictive paragraph of the salon agreements. It seems clear that the phrase "Matrix retail products" as used in paragraph 7 of the salon agreements refers to liquid products. The salon agreements do not actually refer to perms and colors, although it is clear that both Matrix and the salons know that Matrix does not condone

the retail sale of these products. These products carry a legend which reads: "For professional use. Not for retail sale." (*See, e.g.,* Plaintiff's Ex. 14C, a box containing Opticurl Perm). The salon agreements are three party agreements signed by Matrix, the salon and the distributor.

10. Matrix is one of many manufacturers that desires to be known as a "salon only" seller of hair care products. Others include Nexxus, Redken, Paul Mitchell, L'Oreal, Zotos, Goldwell, Mastey, Sebastian, Sukesha, and apparently many others. There are more than 185,000 salons in the United States, some 30% of which sell some Matrix products, and clearly salon patrons are an audience of potential buyers with a much higher propensity to purchase as compared with a typical consumer in a drug store, beauty supply store, supermarket or other kind of retail outlet that might sell hair care products. Matrix distributors generally mark up the product 40% when selling to salons. Matrix also recommends that salons mark up the product an additional 100%. Thus, if Matrix sells a bottle of shampoo to a distributor for $3.00, the ultimate price to the salon patron who purchases a bottle on the way out of the salon will be $8.40. Although there was some evidence that the markup of Matrix products by defendants was lower than that of a typical salon, there was no evidence offered by either party to show the range of markups typical of hair care products marketed through mass retail outlets.

11. Matrix hair care products are marketed under a variety of federally registered trademarks including Matrix, Vavoom, Systeme Biolage, Opticurl, Perm Fresh, Synerfusion, and Adante. Matrix liquid products are sold at retail by salons to their customers, generally from display racks set up in the salon. Although customers may receive advice from a cosmetologist as to what product to buy, Matrix has no objection to the salon selling any liquid product selected by a patron, whether or not recommended by a salon employee. Matrix also does not object to walk-in sales, or sales to buyers who walk into a salon solely for the purpose of purchasing a product and not for any hair care service.

12. Matrix employs some seventy-five full time educational consultants and 1000 part time consultants who visit salons and participate in various kinds of trade shows and exhibitions. These individuals give instruction in the use of various Matrix products and also serve to generate demand among salons to purchase Matrix products for resale. Although Matrix does some direct consumer advertising in magazines and on television, more money is spent on educational programs. Regardless of how a particular expense is categorized for accounting purposes, the evidence is overwhelming that educational expenditures are an integral part of the Matrix sales efforts.

13. Because of the good reputation of many salon-only products, including Matrix products, general non-salon retailers (beauty supply stores, drug stores, and the like) try to obtain supplies of these products. The process by which retailers obtain salon-only merchandise for resale at retail is known as "diversion" and those engaged in the operation are known as diverters. Because of the profit potential to those who participate in diversion, it is a wide spread phenomenon. The attitude of manufacturers who purport to be salon-only sellers varies. Some seem to tolerate or even encourage the practice because it builds up sales, others discourage the practice but do not take strong affirmative action to stop it, while others, like Matrix, actively fight diversion.

14. Diversion of salon-only products, like Matrix, can occur primarily in three ways. First, a wholesale distributor can sell to persons other than salons; second, salons can resell parts of their inventory to retailers; and third, persons known as "collectors" can purchase small quantities of product at numerous salons (with or without salon connivance) and resell them to retailers.

15. Manufacturers can fight diversion in a variety of ways: (1) terminating distributors who they find diverting; (2) requiring distributors to terminate salons that divert; (3) placing "batch codes" on manufactured products that identify the distributor to whom a product was sold; (4) authorizing distributors to place "salon codes" on products that identify the salon to whom the

product was sold; (5) purchasing diverted product from retail outlets in an effort to find codes identifying the source; (6) totally buying out the diverted stock of particular retailers to remove the diverted product from the market; and (7) bringing suit against those who participate in the diversion process. While law suits can be brought against salons or distributors, the ability to cut off the salon or distributor from further supply is usually enough to stop diversion. By contrast, a law suit may be the only way to attack diversion by a retailer who has one or more unidentified sources of supply.

16. Salon codes serve only to identify the salon to whom a distributor sells a Matrix product. Batch codes, on the other hand, not only identify the distributor, but also permit Matrix to locate manufacturing information relating to a product liability suit or to facilitate a product recall should one of its products prove to be hazardous or defectively manufactured. Dr. Murphy testified that at least on a few occasions the batch codes were used to facilitate recalls, although these recalls seem to have been based on the esthetic qualities of the goods rather than on a health risk associated with the recalled goods.

17. Diverters attempt to protect themselves from detection by removing batch codes or salon codes from the product so investigators cannot determine who diverted the product. This leads to counter-measures by the manufacturers or distributors to conceal the location of the codes or to use invisible codes that can be detected only with infra-red light. For instance, when DiDonato suspected that certain salons were responsible for diversion, he would unscrew the cap of a product and place a salon code on the neck of the bottle, where it would be covered up when the cap was replaced.

18. Diversion of salon-only products is widespread and Matrix products can be found in numerous locations around the country notwithstanding its vigorous anti-diversion program. As will be noted later in discussing diversion by the Gullo family, the lure of quick, easy profits makes wide scale diversion almost inevitable. Even today Matrix products can be found in stores located in Camden County and Philadelphia. Cherry Hill Beauty Supply, a competitor of Cosmetic Gallery, carries Matrix products and, in fact, has a store located very close to a Cosmetic Gallery store in Cherry Hill. In DiDonato's territory alone, Matrix products have turned up in over 100 retail outlets, and DiDonato's employees have purchased Matrix products at approximately fifty of those locations.

19. Plaintiff has argued that diversion causes financial loss to the company. There is a total absence of proof to support this factual proposition. It is fairly obvious that, at least in the short run, diversions increase the manufacturer's profit by exposing the product to potential buyers other than salon customers. Plaintiff has asserted as a factual proposition that salons will stop carrying Matrix products if they are available at a nearby retail outlet. However, the only real factual support for this proposition was the testimony of one salon owner in Blackwood, New Jersey, who said she would stop selling Matrix products if they were available in nearby retail stores. There was no expert testimony offered on this issue, and there was even no testimony from Matrix's own financial personnel. Ms. Urban admitted that no salon stopped stocking Matrix products because of Cosmetic Gallery's sale of these products.

20. Even if the court accepted as true the proposition that some salons would stop selling Matrix products if they were available in retail stores, or that such availability would reduce sales by salons that continued to stock Matrix goods, there is simply no basis for concluding that these lost sales would be greater than the increased revenue resulting from the availability of the product in ordinary retail outlets. Even less plausible is the conclusion that diversion by the defendants in this case had any adverse impact on Matrix or would have had any in the future. While the evidence does support a finding that salon-only manufacturers have widely differing attitudes towards diversion, ranging from secret encouragement to grudging acceptance to open hostility, the record is devoid of any evidence upon which one could base a finding as to which approach yields the optimal financial results. One could intuitively infer than tolerating or even secret-

ly encouraging diversion might increase sales on a net basis, but absent competent testimony on the issue, no finding is possible either as a general matter or specifically as to Matrix.

21. The defendants were able to obtain Matrix liquid products and perms from a variety of sources which are listed in paragraph 13 of the stipulations of fact in the Final Pretrial Order. Plaintiff does not allege that defendants sold diverted Matrix coloring products. A major source of diverted product were salons operated by the Gullo family (Dennis, Rick, Silvio ("Sal"), and Robert). From March of 1991 through April of 1992, the Gullos diverted and sold substantial quantities of salon-only products to Cosmetic Galleries. Between 15% and 25% of this diverted product was manufactured by Matrix. The Gullos purchased the Nexxus and Matrix products that they diverted from DiDonato. Dennis, Rick and Sal appear to have started diverting in March or April of 1991, while Robert did not start until July or August of 1991. It is clear that the Gullos, who worked together in the diversion efforts, were aggressive diverters who sold the defendants up to $10–15,000 of goods per week when diversion was at its maximum. The Gullos' markup was between 20% and 25% of their cost, resulting in a weekly profit of between $2,000 and $3,000. Since the Gullos were paid by check or cash at the time of each weekly delivery to the defendants, they made this profit with almost no capital investment and very limited expenditure of time. The large profit available to a handful of local salons demonstrates why diversion is a widespread problem throughout the country.

22. The Gullo diversions had their genesis in early March of 1991 when Dennis Gullo made an appointment to see Charles Eisenberg concerning Gullo's desire to expand the retail sales in his recently enlarged salon. He originally considered buying a Cosmetique franchise, but this proved too expensive. Gullo viewed the diversions as a way to finance his newly expanded salon. Eisenberg promised to decode the diverted products, and generally explained to Dennis Gullo how the operation could be carried out in secrecy. To some extent Dennis Gullo distorted his testimony to lay the entire blame for the diversion on Charles Eisenberg. In fact, the evidence demonstrates convincingly that Dennis Gullo's decision to sell to Cosmetic Galleries was based on a desire to insure economic success for his new 4500 square foot salon, which included 1500 square feet devoted to retail, including two retail clerks who were not cosmetologists. It was Dennis Gullo who got other family members involved, all of whom did what they did for one simple reason—profit. Two of the Gullo diverters, Robert and Rick, had signed salon agreements which were in force during the diversion. Rick Gullo's salon agreement is dated March 8, 1991, (Plaintiff's Ex. 19) and Robert Gullo's is dated July 29, 1991, (Plaintiff's Ex. 18).

23. In April of 1992 DiDonato ceased supplying Matrix products to the Gullos and certain related salons following Ms. Urban's purchase of Matrix products at Cosmetique stores during a visit to New Jersey. The Gullos sued Matrix in state court, and were also originally joined as defendants in this case. DiDonato resumed selling Matrix products to the Gullos as part of a settlement of both the state court case and this suit, pursuant to which the Gullos agreed to cease their diversion activities. The resumption of sales to the Gullos was contrary to the normal Matrix policy of permanently terminating sales to salons caught diverting.

24. When selling diverted Matrix products the defendants attempted to remove any identifiable salon codes. The actual removal was done by Larry Eisenberg using a drill bit, a soldering iron or razor. The defendants did not knowingly remove batch codes, although on occasions they purchased Matrix goods on which batch codes had already been removed. Larry Eisenberg also cut one of the flaps off the bottom of perm boxes and re-taped the bottom, also for the purpose of removing an identifying code of some kind. In some instances the distributor would place the salon code on or near the ingredient listing on the product, so that when Eisenberg removed the salon code he partially obscured some of the ingredients. However, even observing the very limited number of

Matrix products admitted into evidence as exemplars of products diverted by Cosmetic Gallery, there is no basis for the court to conclude that the effect of salon code removal was to obscure ingredient listings in a substantial number of instances. Moreover, to the extent that there was such obscuring, it was the result of the deliberate decision of the distributor to place the salon code on or near the ingredient listing. Only three of the containers offered into evidence by Matrix as exemplars of products purchased from the shelves of Cosmetic Gallery exhibited defaced ingredient listings—and then only partially. (Plaintiff's Exs. 14N, 14O and 14P).

25. As noted earlier, various persons allied with Matrix made purchases of Matrix products from the shelves of Cosmetique stores. Patricia Urban, the Matrix employee in charge of combatting diversion, made purchases in April of 1992 and March of 1993. Mary Anne Jones, a salon operator, made purchases in June of 1991; Renee Thiery made purchases in October 1992; Denise Melroy, a Matrix employee, made purchases in June of 1993; Linda Wiley made purchases in July of 1993; and Scott Keller made purchases in August of 1993. Matrix came into possession of at least 425 units of Matrix products as a result of the various purchases. However, many of these items were effectively disposed of or destroyed by plaintiff before they could be inspected by defendants, notwithstanding that most of the purchases were made for the express purpose of pursuing legal action against defendants. Although this disposition might be called spoliation of evidence, the court will not draw any adverse inference against plaintiff as a result of these actions. In making findings relating to the physical condition of the Matrix products or packaging sold by Cosmetic Galleries, the court will rely its own evaluation of the actual items admitted into evidence, which include items purchased off the shelves of Cosmetic Galleries and other items conceded to be fair exemplars of the product as sold by Matrix in salons.

26. We find that the Matrix goods sold by the defendants were merchantable as that term is defined in *N.J.S.A.* § 12A:2–314. In all instances the products were genuine, una-dulterated Matrix goods. The packaging overall was commercially presentable and not marred or defaced in a manner that would cause any consumer confusion or cause a consumer to think that Matrix was putting shoddy merchandise on the market. Although I was not able to observe most of the 425 units purchased off the Cosmetic Gallery shelves, the evidence on which the court relies for this finding is as follows:

a. Patricia Urban twice used the phrase "vast majority" to describe the percentage of units purchased from Cosmetique and returned to DiDonato which could be described as in re salable condition, although she later backed off this description and referred to 70% as resalable. Of 425 Matrix products purchased at Cosmetique only 196 were retained by Matrix, and plaintiff has not even proven that some or most of the 196 remaining items were actually unsalable. Finally, we have no evidence relating to the condition of the many Matrix products sold by defendants to ordinary consumers during the course of the diversion.

b. The court's own observations of the various items offered into evidence by plaintiff as exemplars of items purchased at Cosmetique lead to the same conclusion. Notwithstanding that these items had been packed, unpacked, and handled on numerous occasions and in some instances had codes removed, the court was surprised to find that the appearance of the merchandise was generally good and did not differ markedly from products on which no codes had been removed.

c. There was no survey or other consumer-based evidence offered by plaintiff that might suggest consumer confusion or a consumer belief that Matrix was countenancing the sale of shoddy merchandise.

d. In order to identify bottles which had salon codes under the cap, DiDonato would mark the bottle with a razor line so that a company shopper would know what bottles had the hidden codes. It is impossible to make any meaningful distinction between this mark and the obliterated salon code, even recognizing that DiDonato replaced the employee who was making the line too deep and visible.

e. We should note here that the court discounted the testimony of Ms. Urban and Ms. Jones, who testified generally as to the condition of the Matrix goods they observed in the Cosmetique stores. Not only is this testimony contradicted by i) evidence of the large number of resold items, ii) the court's own observations of the items offered in evidence, and iii) the testimony concerning the high quality of the Cosmetique retailing operation, but these and other Matrix witnesses in this and other situations often seemed to shade their testimony in any area which they thought would be significant to Matrix in this litigation. Matrix, as plaintiff, had the burden of proving that, taken as a whole, the Matrix goods offered for sale by the defendants were in a poorer condition than a fair average sample of the same products offered for sale in a typical salon. Matrix clearly has not met that burden. There is no doubt that Matrix passionately believes in their salon-only sales policy. Unfortunately, on this and other factual issues, such as damages, Matrix substitutes the passion of its belief for actual evidence in support of that belief.

27. There is no credible evidence that defendants acted in a manner that would lead consumers to think that their activities were specifically authorized or condoned by Matrix. Cosmetique stores carry hundreds, if not thousands, of different items from a wide array of manufacturers. The simple sale of goods at retail in this manner does not connote authorization or approval by a particular manufacturer.

28. The court finds that the home use of permanent wave products or colors does not present any health hazard to users. There is some testimony that Matrix perm products have more concentrated active ingredients than perms sold at retail, although given the vast array of perms available at retail, this evidence was not really quantified in a meaningful way. Even accepting its accuracy, this simply means that the Matrix perm products work faster than a comparable retail product. This may create the risk that the solutions will be left on the hair for too long a period. However, the result is a "bad hair day"— meaning a bad result from a cosmetic point of view. The same would be true for a home user of colors who misuses the product. There is simply no meaningful evidence that home users of Matrix perms or colors are at any risk of suffering adverse health effects from using these products. Even Ms. Sandonato, who went to some lengths to avoid giving any testimony she thought might be harmful to Matrix, finally admitted that "as far as she knows" Matrix perms have never caused hair loss or permanent physical damage.

29. There is evidence that from an esthetic point of view, the chances of an attractive permanent are reduced when done at home. Ms. Sandonato testified that in her opinion, no one could get a good home perm. Given the substantial variety of home perms on the market, this assertion seems excessive, although understandable given the Matrix commitment to salons. However, it is self evident that the experience of a cosmetologist in selecting the right product and in actually doing the work probably increases the odds that the final result will be what the consumer wants or finds attractive. Seeing the top and back of one's own head is always a problem. Notwithstanding this observation, there is absolutely nothing in the record to support the notion that the results achieved by home users of Matrix perms somehow denigrates the product in the mind of the consumer on the theory that the user will blame the bad result on Matrix. There is certainly no survey evidence to support this proposition. Nor is there any evidence from which a court might find the frequency of unsatisfactory results from the home use of Matrix perms. The evidence of this with respect to the home use of Matrix colors is even more lacking.

30. There is strong evidence that Matrix's motive for not offering perms and colors at retail has nothing to do with the perceived health effects on users or the possibility of unattractive hairdos. Rather, the motivation flows naturally from the salon-only marketing strategy. Liquid products such as shampoos, conditioners, and glazes do not replace the need for salon services. These products are routinely used on a daily or frequent basis in the home. Permanent waves and coloring, by contrast, are impor-

tant salon activities which generate significant revenue for salons. Ms. Sandonato, the Matrix Director of Special Education Services, testified that in recent years hair coloring has passed perms as the biggest fee generator for salons. Having a salon sell permanent wave kits or coloring solutions would be self-destructive and would be akin to a barbershop marketing a do-it-yourself haircut kit. Matrix is passionately devoted to servicing the salon market place. Selling perms and colors at retail would be totally inconsistent with that policy.

31. Although defendants were well aware of Matrix's salon-only policy, the court does not find that plaintiff has proven by a preponderance of the evidence that defendants were specifically aware that at least two of the Gullos had signed salon agreements which contained specific anti-diversion obligations. Nor has plaintiff proven by a preponderance of the evidence that there was an oral or implied non-diversion agreement between Matrix and individual salons who did not sign the salon agreements. Indeed, the court finds that the launching of the Synergy Salon Club was motivated in great part by Matrix's desire to get individual salons to contractually agree to a non-diversion policy. It is interesting and informative to note that although Matrix argues that the consideration for the implied contract would be Matrix's obligation to broadly enforce its non-diversion policy against known diverters, the salon agreements contain no such promise from Matrix. Indeed, given the extraordinary range of possible responses to known diversions, it would be impossible to define in meaningful terms the scope of this alleged consideration for the implied promise of a salon not to divert. We know, for instance, that there are several retail outlets in an area not too distant from Cosmetique stores which to this day are still selling Matrix products. While we do not question Matrix's business decision to be selective in the law suits it brings, the selectivity demonstrates the illusory nature of the alleged consideration for the alleged implied promise.

32. There is no evidence that any defendant acted with malice towards the plaintiff or that the conduct of any defendant transgressed generally accepted standards of morality. Defendants sought to obtain high quality, genuine goods and sell them to the public at a price which, hopefully, would be lower than that available in a salon. Defendants had no desire to hurt the Matrix reputation—the very reputation which made diversion so desirable.

## III. CONCLUSIONS OF LAW

At the outset, the court notes that this case involves the efforts of Matrix to control the distribution of its products to the ultimate consumer—and more specifically to control transactions which occur after Matrix has sold its products outright to a wholesale distributor. On summary judgment, the court determined that this distribution scheme was legal and dismissed defendants' antitrust counterclaim.

In this action the plaintiff is trying to enforce its distribution scheme against third parties, with whom it has no contractual relationship, by stretching to their outer limits the doctrine of tortious interference with contract and the Lanham Act, principles which were really intended to deal with a different kind of conduct. This case explores just how far the boundaries of those doctrines can be stretched.

### A. Tortious Interference with Contract

We previously granted defendants' motion for summary judgment on Matrix's tortious interference with contract claim, and then, upon reconsideration, reinstated that claim to the extent that it requested injunctive, rather than monetary, relief. We now hold that Matrix, in some instances, has failed to prove the existence of an enforceable contractual obligation, and in the remaining instances has failed to prove that defendant had knowledge of the terms or existence of the written contract which had been signed by two of the diverters. However, even if there were a valid contract between Matrix and a diverter of which the defendants had knowledge, plaintiff has not presented sufficient evidence of damages or maliciousness to support a permanent injunction for tortious interference with contract.

New Jersey has adopted the *Restatement (Second) of Torts* definition of tortious interference with an existing contract. *See Restatement (Second) of Torts* § 766 (1979); *Norwood Easthill Assocs. v. Norwood Easthill Watch*, 222 N.J.Super. 378, 383, 536 A.2d 1317, 1319 (App.Div.1988). To establish this tort, a plaintiff must prove: (1) an existing contractual relationship; (2) intentional interference with that relationship; (3) the malicious nature of the interference; and (4) damages resulting from the interference. *Norwood Easthill Assocs.*, 222 N.J.Super. at 384, 536 A.2d at 1320.

*1. Intentional interference with an existing contractual relationship.*

A plaintiff may not maintain a tortious interference action "where there is no specific contractual provision barring the behavior at issue." *Polymer Technology Corp. v. Mirman*, 37 F.3d 74, 82 (2d Cir.1994). In this case, Matrix has shown that two diverters, Robert Gullo and Rick Gullo, both signed salon agreements. (Plaintiff's Exs. 18 and 19.) The salon agreements provide that the salon will follow the distribution policies of Matrix and its distributor, and thus will sell Matrix products only to its clients. (*Id.* at ¶ 7). The two Gullo salon agreements are signed by the salon owner, Matrix, and the distributor, DiDonato. (*Id.*)

While we find that these agreements contain adequate contractual terms to support a tortious interference claim, there is no evidence that defendants were aware of the anti-diversion clauses in those contracts. We do not equate general knowledge of the Matrix distribution scheme to knowledge of the existence or contents of the salon agreements. Moreover, Robert Gullo and Rick Gullo were not defendants' only source of diverted Matrix products. There were other Gullo and non-Gullo sources, and there is simply no proof that any of these other diverters had written agreements with Matrix which precluded diversion.

Matrix argues that an implied contractual relationship between itself and the salon owners existed regardless of the existence *vel non* of written salon agreements. Matrix contends that many salons carry Matrix products precisely because they are available only in salons. Thus, argues Matrix, the salons had an understanding, rising to the level of a contractual obligation, that they would sell only to their clients, and not to retailers such as defendants.

It is unclear, however, what obligations Matrix undertook in return for this promise. *See F. Schumacher & Co. v. Silver Wallpaper & Paint Co.*, 810 F.Supp. 627, 635 (E.D.Pa.1992) ("In return for its retail dealers' promises not to transship . . ., [the manufacturer] commits to nothing."). In *F. Schumacher*, a case factually similar to the one at hand, the court found that the manufacturer "merely reserves the option to do that which it is always entitled to do—to stop doing business with retail dealers that act against its interests." *Id.* The court concluded: "To have an internal corporate policy setting forth how business shall be done is one thing. To give that policy legal effect on third parties is quite another." *Id.*

In an attempt to avoid this reasoning, Matrix argues that it did undertake obligations in exchange for the salon owner's promise not to divert goods to retailers. However, it is unclear exactly what Matrix promised to do, or how salon owners could enforce this promise. Matrix seems to allege that it promised to use "reasonable efforts" to prevent diversion. However, the written salon agreements, which impose specific anti-diversion obligations on the salons, makes no reference to any obligation of Matrix to prevent diversion. Furthermore, Matrix is loathe to admit that other salon owners in defendants' area of distribution could have sued Matrix if it failed to adequately prevent diversion. It is, to put it mildly, an unpersuasive argument that the salon's implied promise not to divert was supported by a Matrix promise which was (1) not included in the written agreement embodying alleged implied contract, and (2) so vague that it could not be enforced.

*2. Malicious interference.*

Even if we assumed that Matrix had a contract with salons that prohibited diversion, and that defendants knew of this contract, Matrix has not shown that defendants

"maliciously" interfered with that contract. To establish tortious interference, a plaintiff must show that the interference was undertaken intentionally and with "malice." *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751, 563 A.2d 31, 37 (1989) (*citing Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (E. & A.1934)). *See also Norwood Easthill Assocs.*, 222 N.J.Super. at 384, 536 A.2d at 1320 ("the bare elements of the tort of malicious interference with contractual relations are actual interference with a contract plus proof of the malicious nature of that interference.").

■ The term "malice" does not require ill will toward the plaintiff, but rather "is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Printing Mart*, 116 N.J. at 751, 563 A.2d at 37. To show "malice," the plaintiff must show that the defendant's conduct was " 'transgressive of generally accepted standards of morality'; that is, a violation of standards of 'socially acceptable conduct.' " *Baldasarre v. Butler*, 254 N.J.Super. 502, 526, 604 A.2d 112, 124 (App.Div.1992), *aff'd in relevant part, rev'd in part*, 132 N.J. 278, 625 A.2d 458 (1993) (*quoting Leslie Blau Co. v. Alfieri*, 157 N.J.Super. 173, 189, 384 A.2d 859, 865 (App.Div.), *certif. denied*, 77 N.J. 510, 391 A.2d 523 (1978)).

■ We find that defendants did not act in a manner contrary to "socially acceptable conduct." The *Restatement* equates the malice requirement with an inquiry into whether the defendant's interference with the contract was "improper." *See Restatement (Second) of Torts* § 767 cmt. k. *See also Printing Mart*, 116 N.J. at 752, 563 A.2d at 37 (concluding that the Restatement's inquiry into whether conduct is improper "is substantially similar to the 'malice' standard currently applied by New Jersey courts."). The *Restatement* sets forth seven factors that a court should consider in determining whether intentional interference with a contract is improper: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the party with whom the actor interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other party; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties. *Restatement (Second) of Torts* § 767.

In this case, defendants did not commit tortious acts, such as fraud, and thus the nature of their conduct does not weigh toward imposing liability. *See id.* § 767 cmt. c. Defendants' conduct was proximate to the interference, however, and Matrix and defendants are not in a relationship, such as direct competitors, that would tend to justify interference. *See id.* § 767 cmt. i. Thus, the final two factors favor Matrix. Nonetheless, the remaining factors all weigh heavily toward a finding that defendants did not maliciously interfere with Matrix's contracts.

First, defendants did not act with an improper motive. We find that defendants were not "motivated, in whole or in part, by a desire to interfere with [Matrix]'s contractual relations." *Id.* § 767 cmt. d. Instead, defendants were motivated by a desire to sell Matrix products. Through this action, they did not intend to harm Matrix, and probably wished to see Matrix prosper so that they could sell more products.

Second, defendants simply interfered with Matrix's interest in maintaining its distribution and marketing scheme. One court has held that this type of damage is not even cognizable in a tortious interference case. *See H.L. Hayden Co. of New York v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1024 (2d Cir.1989). Therefore, we do not consider Matrix's interest a strong one.

Third, defendants' interest here was in engaging in the free sale of goods. The *Restatement* makes clear that tortious interference will not normally be found when the parties engage in direct competition. *Restatement (Second) of Torts* § 768. Although Matrix and defendants do not compete directly, the interests at issue here are largely the same as those at issue between direct competitors. Specifically, defendants are simply attempting to make a profit through the sale of Matrix goods, just as a competitor would attempt to make a profit by competing with Matrix for consumers. Such

activity is not "transgressive of generally accepted standards of morality," *Baldasarre,* 254 N.J.Super. at 526, 604 A.2d at 124, but instead is encouraged.

Finally, we believe that the social interests involved weigh in defendants' favor. Defendants are simply engaging in the purchase and sale of goods, an encouraged and generally lawful activity. While we do not disparage the social value of salon-only hair-care products, there is no significant social interest in using the courts to enforce a particular seller's scheme of distributing its goods. We note that Matrix possesses effective alternative means of enforcing its marketing concepts, principally by exercising its contractual rights against distributors or salons who participate in unwanted diversion. In light of the alternative remedies available to Matrix, we believe that the social interest in effective price competition and the free flow of goods tilts this factor toward defendants.

### 3. Damages.

■ Matrix argues that it need not establish actual damages as an element of a tortious interference claim. In *Nappe v. Anchelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224 (1984), the New Jersey Supreme Court held that actual damages are not an essential element of an intentional tort, where the plaintiff suffers "some loss, detriment, or injury" in connection with the tort. 97 N.J. at 47–48, 477 A.2d at 1229. Matrix argues that tortious interference is an intentional tort, and thus does not require proof of actual damages.

*Nappe,* however, does not govern our inquiry. As the Third Circuit pointed out in *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3d Cir.1993), *Nappe* addressed the tort of intentional fraud. 4 F.3d at 1168 n. 7. The *Witco* court further stated that "the New Jersey Supreme Court does not appear to have extended [*Nappe*] to the cause of action of tortious interference." *Id.* (*citing Printing Mart,* 116 N.J. at 752, 563 A.2d at 37).

Indeed, the court in *Printing Mart* specifically stated that a tortious interference cause of action "must allege that the injury caused damages." 116 N.J. at 752, 563 A.2d at 37.

Other post-*Nappe* courts in New Jersey have also concluded that damages are an element of a tortious interference claim. *See Norwood Easthill Assocs.,* 222 N.J.Super. at 385, 536 A.2d at 1320 ("some damage" is required to maintain a tortious interference claim). Thus, we hold that damages are an essential element of Matrix's tortious interference claim, and Matrix has utterly failed to prove any damages.

■ Having reached this conclusion, we must next decide whether this same standard applies to tortious interference claims that request injunctive relief only. Although New Jersey courts have not addressed this issue, at least one other district court in this circuit has concluded that a showing of damage is necessary for injunctive relief. In *F. Schumacher & Co. v. Silver Wallpaper & Paint Co.,* 810 F.Supp. 627, 635 (E.D.Pa.1992), the plaintiff, a manufacturer of wallcoverings, established a Marketing & Advertising Policy that prohibited its retail dealers from, *inter alia,* reselling plaintiff's wallcoverings to other retailers without plaintiff's approval. 810 F.Supp. at 629. Defendant was originally one of plaintiff's retail dealers, but when plaintiff discovered that defendant had violated the Marketing & Advertising Policy, plaintiff terminated its relationship with defendant. *Id.* Nonetheless, defendant continued selling plaintiff's wallcoverings, by purchasing them through retail dealers that defendant knew were not allowed to resell the products to other retailers. *Id.* at 629–30.

Plaintiff brought a tortious interference with contract claim requesting injunctive relief. The district court denied this claim, because it found that the Marketing & Advertising Policy did not constitute an enforceable contractual provision between plaintiff and its retail dealers. *Id.* at 635. Nonetheless, in a footnote, the court indicated that even if the Marketing & Advertising Policy was enforceable, plaintiffs had not "proven pecuniary injury sufficient to support an injunction." *Id.* at 635 n. 8 (*citing Restatement (Second) of Torts* § 766 cmt. u).

The Second Circuit has adopted the same position. In *H.L. Hayden Co. of New York v. Siemens Medical Systems, Inc.,* 879 F.2d

1005 (2d Cir.1989), Siemens was a supplier of dental x-ray equipment, while Hayden was a full-service dental equipment dealer that sold Siemens equipment. 879 F.2d at 1009. The owner of Hayden then founded Schein Dental, a mail-order firm that sold dental equipment at a discount. *Id.* Siemens informed Hayden that it could no longer sell Siemens products to third parties, including Schein Dental, and instituted an "Authorized Dealership Agreement" to this effect, which Hayden refused to sign. *Id.* Hayden continued to sell Siemens products to Schein Dental, and was eventually terminated as a Siemens dealer. *Id.*

The Second Circuit affirmed the district court's grant of summary judgment in favor of Hayden on Siemens' tortious interference counterclaim. 879 F.2d at 1024. In doing so, the circuit agreed with the district court's conclusion that "Siemens suffered no pecuniary loss either in the sales, since it profited from them, or from the expense of tracking down the sources of Schein Dental's equipment, as this was a necessary part of enforcing the Dealership Agreement." *Id.* The Second Circuit also rejected Siemens' argument that loss of control over the distribution of its products, increased exposure to products liability suits, and "undermining of Siemens marketing strategy" constituted damages that would support a tortious interference claim. *Id.* The court upheld the denial of both monetary and equitable relief, concluding that "pecuniary injury is an element of this tort and must be established as a basis for injunctive relief, as well as damages." *Id.* (*citing Restatement (Second) of Torts* § 766 cmt. u).

■ Similarly, we find that Matrix has not established the damage necessary to justify injunctive relief in a tortious interference claim. Indeed, Matrix presented very little evidence of damage from the alleged tortious interference. Urban and DiDonato both testified that when Matrix products become available in retail stores such as defendants', they receive complaints from salons that carry Matrix products. Matrix also offered the testimony of Mary Jones, a salon owner, who stated that she would stop carrying Matrix products if they were widely available in retail stores. However, there is not a shred of proof to support the proposition that the increased sales which result from the activities of diverters would be offset by the loss of salon sales.

Matrix's passionate but unproven assertion of potential lost salon sales does not support an injunction for tortious interference with contract. Just as in *Hayden,* Matrix profited from the initial sale of Matrix products to defendants. To the extent that Matrix claims damages based on a loss of control over its distribution and marketing strategies, this is the very argument rejected by the court in *Hayden.*

Matrix cites two cases for the proposition that interference with the salon-only distribution of hair-care products in itself causes damage. These cases, however, are inapposite. In *Sebastian Int'l, Inc. v. Consumer Contacts (PTY) Ltd.,* Civ. No. 87–1995, 1988 WL 24147 (D.N.J. Mar. 11, 1988), the court simply held that, based on the factual record existing at the time of defendants' summary judgment motion, a material issue of fact existed as to whether plaintiff had suffered damages. *Id.,* at *5–6. Similarly, in *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.,* 698 F.2d 1011 (9th Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983), the court, in upholding the district court's grant of summary judgment on the ex-distributors' antitrust claim, stated only that some salons "will therefore refuse to carry products that are generally available OTC [over-the-counter]." 698 F.2d at 1013.

These cases, however, do not establish a *per se* rule that damage always occurs when one interferes with a salon-only distribution scheme. Indeed, the *JBL* court did not find that the violation of an exclusive distribution scheme caused damages, but rather held, as has this court, that the distribution scheme was reasonable under the antitrust laws. *See* 698 F.2d at 1015. In this case, Matrix's failure to adduce evidence to show that harm will result from defendants' actions is fatal to its tortious interference with contract claim, whether it requests injunctive relief or money damages.

Even if Matrix had established a tortious interference claim, we would hold that it is

not entitled to a permanent injunction. This court may enter a permanent injunction only " 'after a showing of both irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest.' " *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.,* 913 F.2d 64, 82 (3d Cir.1990) (*quoting Natural Resources Defense Council v. Texaco Refining and Marketing, Inc.,* 906 F.2d 934, 941 (3d Cir.1990)), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991)). A permanent injunction will issue "only where a threat of harm exists, not just where potential harm exists." *McLendon v. Continental Can Co.,* 908 F.2d 1171, 1182 (3d Cir.1990). Therefore, " '[an injunction] may not be used simply to eliminate a possibility of a remote future injury....' " *Acierno v. New Castle County,* 40 F.3d 645, 655 (3d Cir.1994) (*quoting Continental Group, Inc. v. Amoco Chem. Corp.,* 614 F.2d 351, 359 (3d Cir.1980)). Because Matrix's evidence of damage, irreparable or otherwise, is speculative at best or non-existent at worst, injunctive relief is not warranted.

## B. Trademark Infringement and Unfair Competition

■ Likelihood of consumer confusion is the "linchpin" of a trademark infringement or unfair competition claim. *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 590 (5th Cir.1993). We have already ruled that defendants' sale of unaltered Matrix liquid products does not create a likelihood of consumer confusion, and thus granted defendants' motion for summary judgment on that issue. *See id.* at 591 (holding that a diverter's sale of unaltered Matrix liquid products does not create a likelihood of consumer confusion). We now decide that neither defendants' sale of defaced Matrix products nor its sale of Matrix perms created a likelihood of consumer confusion.

### 1. Sale of defaced products.

"Trademark rights are 'exhausted' as to a given item upon the first authorized sale of that item." J. McCarthy, *McCarthy on Trademarks* § 25.11[1] at 25–61 (3d ed. Release # 2, Apr. 1994). Thus, as a general

rule, " 'trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent.' " *Matrix,* 988 F.2d at 590 (*quoting Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104, 107 (4th Cir.1991)).

■ In the case of damaged goods, however, trademark infringement may occur if "there exists a material difference between the products sufficient to create a likelihood of consumer confusion." *John Paul Mitchell Sys. v. Pete–N–Larry's Inc.,* 862 F.Supp. 1020, 1023 (W.D.N.Y.1994) (*citing Societe Des Produits Nestle v. Casa Helvetia,* 982 F.2d 633, 640 (1st Cir.1992)). Courts will find a "material difference" if the goods are " 'seconds' of inferior quality" or have been "taint[ed] ... by mishandling." *Henry v. Chloride, Inc.,* 809 F.2d 1334, 1350 (8th Cir. 1987) (*citing Burlington Mills Corp. v. Roy Fabrics,* 91 F.Supp. 39, 47 (S.D.N.Y.), *aff'd,* 182 F.2d 1020 (2d Cir.1950), *and Adolph Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131, 135–36 (D.Colo.1980)).

■ In this case, we find that the damage done to Matrix products did not create a likelihood of consumer confusion. The actions undertaken by defendants in no way compromised the quality of Matrix hair products themselves. Furthermore, the minor esthetic damage done to the containers of these products did not create a likelihood that consumers would think that Matrix intentionally distributed shoddy goods. Therefore, the damage done to the product containers in this case did not constitute trademark infringement.

Defendants not only damaged Matrix products, but also damaged them intentionally. Courts have recognized that "proof of defendant's 'bad' intent to confuse is relevant to likelihood of confusion...." McCarthy, § 23.31[2] at 23–197. The defendants' intent is relevant because "if defendant intended confusion, this tends to show confusion of customers in fact." *Id.* § 23.32[1] at 23–199.

While the defendant's intent is usually most relevant in cases of "palming off," *id.,* at least one court has applied a similar analysis to the intentional defacement of goods. In *Paddington Corp. v. Major Brands, Inc.,*

359 F.Supp. 1244 (W.D.Okla.1973), the plaintiff, Paddington, was the sole United States distributor of J & B Scotch. The defendant, Major Brands, bought J & B Scotch marked for duty-free sale only, and instead resold it wholesale. In doing so, Major Brands affixed a label bearing the legend "Imported by Major Brands, Oklahoma City," over the duty-free sticker on the bottle. · 359 F.Supp. at 1247. Major Brands also covered a label bearing the legend "Imported by the Paddington Corporation, New York, New York," with a plain white label. *Id.*

The court granted Paddington's motion for summary judgment on its request for injunctive relief. The court found that

> Major Brands' mutilation of the J & B labels by designating itself as the importer in place of Paddington and pasting over the "duty-free" marking was an unconscionable attempt to deceive and mislead both wholesalers and consumers as to Major Brands' relationship with [J & B], and may well have injured the business reputation of both [J & B] and Paddington.

*Id.* at 1248. The court also found that "the mutilation of J & B labels misled consumers into believing that Paddington and [J & B] deal in 'seconds' or Scotch whiskeys of an inferior quality to that marketed under the unmutilated J & B label." *Id.*

■ *Paddington* shows that even intentional defacement will not create a likelihood of consumer confusion unless it: (1) causes consumers to believe that the seller is authorized to distribute the product, when it is not; or (2) compromises the manufacturer's quality control standards. Here, defendants did not attempt to deceive consumers as to their relationship with Matrix, and their sale of Matrix products did not damage Matrix's business reputation. Furthermore, we have already found that the esthetic damage done to Matrix bottles would not lead consumers to believe that Matrix dealt in shoddy goods.

In sum, while intentional defacement of a product may support an inference of consumer confusion, it will only create a likelihood of consumer confusion if the product is defaced in a way that would confuse consumers. In this case, defendants did not even intend to deceive consumers by altering the product, but simply sought to avoid detection by Matrix. Furthermore, even if this defacement was "intentional," it did not create a likelihood that consumers will believe either that defendants are in some way authorized to sell Matrix products, or that Matrix lowered its quality control standards. Thus, defendants' intentional defacement of the product does not constitute trademark infringement.

### *2. Sale of perms for home use.*

■ Plaintiff alleges that defendants' sale of Matrix permanent wave products for home use constitutes trademark infringement insofar as it deprives Matrix of its ability to provide the "professional consultation" that should accompany the sale of these products. Plaintiff had raised a similar argument with respect to liquid products, but the court granted defendants' motion for summary judgment on this claim except as to the sale of Matrix perms.

Courts have held that "[a] distributor's failure to observe a restrictive condition on the type or class of customers with whom it may deal can constitute trademark infringement, but more is required than unauthorized sales standing alone." *Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 63 (2d Cir.1992). Thus, if Matrix could show that the lack of professional consultation would in some way harm its trademark, sale without professional consultation might constitute trademark infringement.

Matrix's most helpful case is *Clairol, Inc. v. Boston Discount Ctr. of Berkley, Inc.*, 608 F.2d 1114 (6th Cir.1979). In *Clairol*, the trial judge found that the sale of plaintiff's professional use only hair-care products "without proper instructions can cause allergic reactions or customer dissatisfaction because of hair discoloration or damage or other unsatisfactory result." 608 F.2d at 1117. Furthermore, the sale of unlabelled professional use only products exposed the manufacturer to criminal liability. *Id.* at 1120. Thus, the defendant's practice damaged both the public and the manufacturer, and violated Michigan unfair competition law. *Id.*

We find *Clairol* unpersuasive. Recent courts have been more skeptical of the need

for professional consultation in the sale of goods. *See H.L. Hayden,* 879 F.2d at 1023 (in a case involving the unauthorized sale of dental equipment, finding that "customers are well aware that what they purchase ... is simply the manufactured product and not its installation") (internal quotations omitted). Indeed, in *Polymer Technology Corp. v. Mirman,* 841 F.Supp. 523 (S.D.N.Y.1994), *on remand from,* 975 F.2d 58 (2d Cir.1992), *aff'd,* 37 F.3d 74 (2d Cir.1994), the district court rejected the Sixth Circuit's interpretation of the facts in *Clairol* in favor of that of the Supreme Judicial Court of Massachusetts: "Clairol, it seems to us, largely seeks to protect what has been an effective marketing and advertising devise." *Clairol, Inc. v. Cody's Cosmetics, Inc.,* 353 Mass. 385, 393, 231 N.E.2d 912, 917 (1967) (*quoted in Polymer,* 841 F.Supp. at 530).

We believe that this description applies to the facts at hand. The evidence has not shown that Matrix permanent wave or coloring products present a health or safety risk to home users. Furthermore, we have found that consumers who use Matrix products at home will not blame their "bad hair days" on Matrix. In other words, we agree with the Fifth Circuit's conclusion that "Matrix's use of professional hair care salons as its exclusive distribution channel seems more marketing-related than quality-related." *Matrix,* 988 F.2d at 592. Thus, defendants' sale of Matrix products, including perms and colors, without the availability of a professional consultation does not infringe the Matrix trademark.

### 3. Unfair competition.

■ Finally, we must address Matrix's unfair competition claim under the Lanham Act and New Jersey statutory and common law. At the outset, we note that Matrix has never seriously contended throughout the course of this case that its unfair competition claim differs in any material way from its trademark claim. We now find that the unfair competition claim fails for the same reasons as the trademark claim.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), imposes civil liability upon one who, in connection with the sale of goods, makes a false or misleading representation of fact that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods...." 15 U.S.C. § 1125(a). Thus, as in the trademark action, "the touchstone of a section 1125(a) unfair competition claim is whether the defendants' actions are 'likely to cause confusion.'" *Matrix,* 988 F.2d at 592.

We have already found that neither defendants' sale of Matrix products with defaced packaging nor its sale of perms without professional consultation created a likelihood of consumer confusion. Thus, Matrix's section 43(a) claim, like its trademark claim, fails. *See Matrix,* 988 F.2d at 592–93 (rejecting plaintiff's unfair competition claim); *H.L. Hayden,* 879 F.2d at 1022–24 (same).

Matrix's common law unfair competition claim meets the same fate. A key element of unfair competition under either *N.J.S.A.* § 56:4–1 or New Jersey common law is the likelihood of consumer confusion. *Holiday Inns, Inc. v. Trump,* 617 F.Supp. 1443, 1465 (D.N.J.1985). Because Matrix has failed to establish consumer confusion, this claim fails as well.

## IV. CONCLUSION

We find that Matrix has not met its burden of proving a tortious interference, Lanham Act, or New Jersey unfair competition claim, and enter judgment for defendants on all plaintiff's claims. Because the Florida corporations were joined in this action solely as successor corporations to defendants Cosmetic Gallery and C & L, all claims against these parties are also dismissed.